NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210274-U

NO. 4-21-0274

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* H.T. and E.T., Minors | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 19JA92 |
| v. | ) | |
| Holly T., | ) | Honorable |
| | ) | J. Brian Goldrick, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding the trial court's best-interest finding terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    On April 14, 2021, the trial court terminated the parental rights of respondent, Holly T., as to her children, E.T. (born December 7, 2016) and H.T. (born December 5, 2018). Respondent father, Robert T., is not a party to this appeal. On appeal, respondent argues the trial court's best-interest finding terminating her parental rights was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                A. Initial Proceedings

¶ 5    In October 2019, the State filed a petition for adjudication of wardship, alleging the minors' environment was injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2018))

where respondent and respondent father (1) had unresolved issues of alcohol or substance abuse, (2) failed to provide adequate shelter for the minors, and (3) left the minors without reasonable supervision for an unreasonable amount of time. Subsequently, the trial court granted the Department of Children and Family Services (DCFS) temporary custody and guardianship of the minors.

¶ 6        In December 2019, the trial court entered an adjudicatory order finding the minors neglected in that the minors' environment was injurious to their welfare where respondent and respondent father admitted to having unresolved issues of substance abuse. In a February 2020 dispositional order, the court (1) found respondent unfit, (2) made the minors wards of the court, and (3) granted DCFS guardianship and custody.

¶ 7                                B. Termination Proceedings

¶ 8        In October 2020, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent failed to (1) make reasonable efforts to correct the conditions that were the basis for the removal of the minors from her within nine months after adjudication, specifically December 19, 2019, to September 19, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)) and (2) make reasonable progress toward the return of the minors within nine months after adjudication, specifically December 19, 2019, to September 19, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 9                                1. *Fitness Hearing*

¶ 10       In December 2020, the trial court held a hearing at which respondent admitted she failed to make reasonable progress toward the return of the minors within nine months after adjudication, specifically December 19, 2019, to September 19, 2020 (750 ILCS 50/1(D)(m)(ii)

(West 2018)).  Based on respondent's admission and an extensive factual basis offered by the State, the court found respondent unfit by clear and convincing evidence.

¶ 11                              2. *Best-Interest Hearing*

¶ 12          In April 2021, the trial court held a best-interest hearing where the court heard testimony and received best-interest reports from the court appointed special advocate (CASA) and DCFS.

¶ 13                              a. Nicole Edwards

¶ 14          Nicole Edwards, the minors' foster mother, testified the children were initially placed in her home but were placed with fictive kin after two weeks.  The children were returned to Nicole in October 2020.  Nicole worked as a medical office assistant, and her husband, Joshua, worked for Home Sweet Home Ministries.  According to Nicole, E.T. was a sweet child who was "very anxious at certain times."  E.T. gained a lot of trust since being placed with Nicole, and he loved school.  As an example of E.T.'s growing trust, Nicole testified he was initially scared of having a bath but now loved baths and would sleep through the night.  Nicole testified counseling helped E.T. and he had gotten better with listening.

¶ 15          Nicole testified H.T. was very loving and was developing more personality every day.  H.T. was a good eater and became more talkative after being placed with Nicole.  The children transitioned well to a daily schedule of having breakfast and going to daycare.  According to Nicole, the minors get picked up from daycare by 5:30 p.m. and come home, eat supper, play, have baths, and go to bed.  Nicole testified she loved the children and had a strong bond with them.  The children were also bonded with her husband, and they displayed signs of affection.  According to Nicole, she and her husband wanted to adopt the minors.  Nicole opined it was in the children's best interest to stay in her home and a move would be "catastrophic for

their development." If something were to happen to Nicole and her husband, the children had established relationships with grandparents, aunts, and uncles who could care for them, although there was no set plan. Nicole and her husband would be willing to adopt the children even if there was no DCFS subsidy to assist financially.

¶ 16                                                b. Joshua Edwards

¶ 17            Joshua Edwards testified he and his wife, Nicole, were willing and had a desire to adopt the children. According to Joshua, the children were loving and caring, and he enjoyed reading to them every night before bed. Joshua opined it was in the children's best interest to remain in his home and removing them would be traumatizing. The children made positive improvements since being in the foster placement, and H.T. was speaking in full sentences.

¶ 18                                                c. Respondent

¶ 19            Respondent testified she had a video visit with the children the previous day because the foster father had COVID-19. Respondent had in-person visits at DCFS, and the children would run to her for the snacks and toys she brought. According to respondent, the children were very affectionate and happy to see her at visits. Respondent testified there would be no drugs in her system if she completed a screen and she stopped using illicit substances because her children needed her. Although it would be a change if the children were removed from their foster placement, respondent did not think it would traumatize them.

¶ 20            Respondent testified E.T. was a very hyper, bouncy, energetic boy. According to respondent, this was not a negative trait but was something that needed to be worked on. Before the children were removed from her care, respondent was working on getting E.T. into treatment because a friend who worked at Easter Seals thought he had "slight autism." Respondent testified she was currently living with her friend, Chastity, and Chastity's three children.

Chastity was willing to allow the minors to live in her home. Respondent testified she had been living with Chastity for approximately two weeks and had stayed there sporadically in the past. Respondent acknowledged she moved several times during the case.

¶ 21 Respondent testified the children got emotional and cried at the end of visits but she comforted them and gave them a sense of security. According to respondent, the children wanted to be with her. Respondent testified it would hurt the children if she were not allowed to have contact with them. According to respondent, the children were bonded with her and not having contact would particularly devastate H.T. Respondent testified she could provide a safe, stable, happy home for the children at Chastity's house. Respondent testified she was sober and her children were her top priority.

¶ 22 Respondent testified she had trouble securing stable employment due to the COVID-19 pandemic. According to respondent, she had two potential job opportunities but she was rejected because she refused to get the COVID-19 vaccine. Respondent acknowledged she had a history of substance abuse and was recommended for residential treatment. Respondent never engaged in residential treatment. Respondent failed to complete individual counseling.

¶ 23 d. Respondent Father

¶ 24 Respondent father testified he was arrested in November 2019 and was taken into custody a second time in March 2020. Prior to his incarceration in March 2020, respondent father had weekly visits with the children. Respondent father testified visits went well and the children were excited to see him. According to respondent father, he had an upcoming court date in his criminal case that he expected to result in "charges amended and then allowed to bond out."

¶ 25 Respondent father testified he chose to be imprisoned at a prison that offered substance abuse treatment. According to respondent father, he wanted to change his life for the better and be a father to his children. Respondent father completed the Aim Higher Program, a 12-week program designed to change the way a person thinks. Respondent father was also participating in a program addressing his criminal conduct and substance abuse issues. If respondent father were released from prison and told to complete inpatient services, he would do so immediately.

¶ 26 Respondent father testified his relationship with the children was "[i]ntertwined and tight." Respondent father described doing laundry with E.T., going to the store with the children, and playing with the children. According to respondent father, it would not be traumatic for the children to be moved from their foster placement. Respondent father opined it would not be in the minors' best interest to terminate his parental rights because of his bond with them. Respondent father said he would complete all services when he was released from prison and asked for a few more months to complete services. Respondent father's projected parole date was November 2023.

¶ 27 e. Trial Court's Findings

¶ 28 After hearing the evidence, the trial court found it was in the minors' best interest to terminate respondent's parental rights. The court gave a lengthy oral pronouncement where it weighed the statutory best-interest factors. Initially, the court noted the children had been in foster care for 18 months, which was approximately two-thirds of H.T.'s life and one-third of E.T.'s life. The court discussed the history of the case and respondent's struggles with substance abuse. The court noted respondent's mother had passed away recently and she had provided a stabilizing force for respondent. Respondent failed to engage in counseling and refused to enter

inpatient treatment for her substance abuse issues. The court noted respondent tested positive for cocaine and amphetamines as late as October 2020 and methamphetamine as late as November 2020. The court stated respondent lacked a stable place to live and failed to gain stable employment.

¶ 29        The trial court determined the age and needs of the minors, including their physical safety and welfare, food, shelter, health, and clothing, clearly favored termination of parental rights. The foster placement met the children's needs on a daily basis for the previous six months. The court discussed the children's sense of attachment and acknowledged the children recognized respondent and had a connection with respondent. However, on a daily basis, the foster family provided the children with love, attachment, and a sense of being valued. The court noted the children were thriving in their foster placement and were settling in to being children.

¶ 30        The trial court discussed the children's community ties, including church and school. The court noted the children had consistency in the daycare they attended. The court noted the foster placement and respondent both preferred to provide long-term care but determined the foster placement was able to provide that care and respondent was not. The court found a risk to the children to remain in substitute care due to the uncertainty of the situation. The court found the need for permanence weighed in favor of termination because the children were in a stable placement and reunification with respondent was not probable or practical. The court concluded the factors weighed in favor of termination and the termination was in the minors' best interest.

¶ 31        This appeal followed.

¶ 32                                II. ANALYSIS

¶ 33        On appeal, respondent argues the trial court's best-interest finding terminating her parental rights was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 34                              A. Standard of Review

¶ 35        "At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination [of parental rights] is in the child's best interest." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). The reviewing court will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence. *Id.* A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate the court should have reached the opposite result. *Id.* Ultimately, the trial court is in the best position to determine the credibility of the witnesses. *In re K.B.*, 314 Ill. App. 3d 739, 748, 732 N.E.2d 1198, 1206 (2000).

¶ 36        At the best-interest stage of termination proceedings, " 'the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.' " *In re T.A.*, 359 Ill. App. 3d 953, 959, 835 N.E.2d 908, 912 (2005) (quoting *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004)). The trial court takes into consideration the best-interest factors in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)).

¶ 37                              B. Best-Interest Finding

¶ 38        Respondent argues the trial court's best-interest finding was against the manifest weight of the evidence and did not place enough emphasis on the children's attachment to respondent. We disagree with respondent. As evidenced by the trial court's lengthy ruling, it

adequately weighed all the relevant statutory best-interest factors and properly determined the factors weighed in favor of terminating respondent's parental rights.

¶ 39   The trial court determined the age and needs of the minors, including their physical safety and welfare, food, shelter, health, and clothing, clearly favored termination of parental rights where the foster placement met the children's needs on a daily basis for the previous six months. The court discussed the children's sense of attachment and acknowledged the children recognized respondent and had a connection with respondent. However, on a daily basis, the foster family provided the children with love, attachment, and a sense of being valued, and the children were thriving in their foster placement.

¶ 40   The trial court discussed the children's community ties, including church and school. The court noted the children had consistency in the daycare they attended. Respondent argues the court ignored the fact that the children were placed with a family friend for six months and the children's ties to the family friend show the court's determination was against the manifest weight of the evidence. However, no evidence of the children's ties to the family friend was adduced at the hearing. The foster mother testified E.T. loved going to school. The court's decision that this factor weighed in favor of termination was not against the manifest weight of the evidence.

¶ 41   Both the foster placement and respondent wished to provide long-term care, but respondent was not in a position to provide permanency for the children. Respondent had been living at a friend's house for only two weeks, and it appears from the record that stable housing was a consistent problem. Additionally, respondent had no stable employment. In contrast, the children had been in a stable placement for six months, the foster family met the children's daily needs, and the foster family was willing to provide permanence for the children through

adoption. The court's finding that the children's need for permanence weighed in favor of termination was not against the manifest weight of the evidence.

¶ 42 Our review of the trial court's best-interest finding indicates the court carefully considered each factor and did not give any one factor undue weight. Although the court emphasized the children's need for permanence and stability, it did not give this factor excessive weight. Accordingly, we find the trial court's termination of respondent's parental rights was not against the manifest weight of the evidence. Therefore, we affirm the court's judgment.

¶ 43 III. CONCLUSION

¶ 44 For the foregoing reasons, we affirm the trial court's judgment.

¶ 45 Affirmed.